# UNITED STATES DISTRICT COURT

### for the

### Central District of California

| | |
|---|---|
| In the Matter of the Search of 1365 Darius Ct, City of Industry, California 91745 | ) ) ) |
| | Case No. 2:24-MJ-3717 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

*See Attachment A-1*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized):*

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 549 | Removing Goods from Customs Custody |
| 18 U.S.C. § 371 | Conspiracy |
| 18 U.S.C. § 545 | Smuggling |
| 18 U.S.C. § 542 | Entry of Goods By Means of False Statement |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of_____days (*give exact ending date if more than 30 days*:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____/s/_____
*Applicant's signature*

Martina Doino, HSI Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

City and state: Los Angeles, CA

The Hon. Alka Sagar, Magistrate Judge
*Judge's signature*
*Printed name and title*

AUSA: Colin Scott (x3159)

**ATTACHMENT A-1**

**PREMISES TO BE SEARCHED**

The premises to be searched is a one story 23,000 Square foot warehouse, with tan exterior walls located at 1365 Darius CT, Hacienda Heights, CA 91745 (the "SUBJECT PREMISES 1").  The front of the warehouse has tan/green exterior walls.  The number and street address 1365 Darius CT is indicated in blue lettering on small exterior wall by the front entrance.  SUBJECT PREMISES 1 is depicted in the photograph below.  SUBJECT PREMISES 1 includes any garage, storage containers, parking spaces, offices, rooms, and closets exclusively assigned to SUBJECT PREMISES 1 and the vehicles parked on the curtilage and the driveway.



## ATTACHMENT B

**ITEMS TO BE SEIZED**

1.    The items to be seized are evidence, contraband fruits, or instrumentalities of violations of 18 U.S.C. § 549 (Removing Goods from Customs Custody); 18 U.S.C. 371 (Conspiracy); 18 U.S.C. § 545 (Smuggling Goods into the United States); and 18 U.S.C. § 542 (Entry of Goods by Means of False Statements) (collectively, the "SUBJECT OFFENSES"), namely:

a.    Any high security bolt seals, including any counterfeit or duplicate high security bolt seals;

b.    Any communications between James Rosales and Sonic ZHENG regarding the diversion of cargo containers;

c.    All records related to the shipment of containers with the following seal numbers: SYA0247776, SYA2110804 GCXU5487131, CSNU8204660, and GCXU5487131, GCXU5622150 , OOLU6779024 and others which were diverted to the SUBJECT PREMISES 1 and 2;

d.    Any counterfeit items or prohibited food items deemed not inspected by CBP;

e.    Data, records, documents, programs, applications or materials relating to the smuggling of goods, including ledgers, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and/or times of smuggled goods were bought, sold or otherwise distributed and any materials, documents, or records that are related to the sale, purchase, receipt, or possession

31

of any smuggled goods, including books, receipts, photographs, bills of sale, shipping receipts, identification cards, bank statements, and correspondence discussing, requesting or confirming purchase, sale or shipment;

      f.   Tools, paraphernalia, or materials used as a means of packaging, selling, or distributing smuggled goods;

      g.   Any indicia of occupancy, residency, or ownership of the SUBJECT PREMISES and things described in the warrant, including forms of personal identification, records relating to utility bills, telephone bills, loan payment receipts, rent receipts, trust deeds, lease or rental agreements, addressed envelopes, escrow documents, keys, photographs, letters, mail, canceled mail envelopes, or clothing;

      h.   Items of personal property reflecting names, addresses, telephone numbers, or communications of members or associates involved in the smuggling activities, including personal telephone books, address books, telephone bills, photographs, videotapes, facsimiles, personal notes, cables, telegrams, receipts, and documents and other items;

      i.   Any bills and/or subscriber documents related to digital devices;

      j.   United States currency, money orders, or similar monetary instruments over $1,000 or bearer instruments worth over $1,000 (including cashier's checks, traveler's checks, certificates of· deposit, stock certificates, and bonds);

      k.   Items used in the packaging of currency for consolidation and transportation, such as money-counting

machines, money wrappers, rubber bands, plastic or shrink wrap, and plastic sealing machines;

l.   Records, documents, programs, applications, or materials reflecting or relating to payment, receipt, concealment, transfer, or movement of money, including but not limited to bank account records and other financial institution records, wire transfer records, receipts, safe deposit box keys and records, and notes;

m.   Records, communications, information, documents, programs, applications, or materials relating to communications made or records submitted to U.S Customs and Border Protection concerning the importation of merchandise;

n.   Records, communications, information, documents, programs, applications, or materials relating to communications made or records submitted to logistics companies or transporters of cargo containers;

o.   Records, communications, information, documents, programs, applications, or materials relating to communications made or records submitted to any/all customs house broker(s);

p.   For all digital devices, records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show address book information, including all stored or saved telephone numbers;

q.   For all digital devices, records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any digital devices used to

33

facilitate the SUBJECT OFFENSES and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

r.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email or social media communications or other text or written communications sent to or received from any digital device;

s.   Contents of any calendar or date book, including any calendars or date books stored on any digital devices;

t.   Audio recordings, photographs, video recordings or still captured images on any digital device, phone memory cards, or other storage related to the purchase, sale, transportation, or distribution of controlled substances and listed chemicals or the collection, transfer or laundering of the proceeds of illegal activities;

u.   GPS coordinates and other location information or records identifying travel routes, destinations, origination points, and other locations;

v.   Any digital device used to facilitate the above listed violations and forensic copies thereof.

112. Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the SUBJECT OFFENSES, and forensic copies thereof.

113. With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

a.    evidence of who used, owned, or controlled the
device at the time the things described in this warrant were
created, edited, or deleted;

b.    evidence of the presence or absence of software
that would allow others to control the device, such as viruses,
Trojan horses, and other forms of malicious software, as well as
evidence of the presence or absence of security software
designed to detect malicious software;

c.    evidence of the attachment of other devices;

d.    evidence of counter-forensic programs (and
associated data) that are designed to eliminate data from the
device;

e.    evidence of the times the device was used;

f.    applications, programs, software, documentation,
manuals, passwords, keys, and other access devices that may be
necessary to access the device or data stored on the device, to
run software contained on the device, or to conduct a forensic
examination of the device;

g.    records of or information about Internet Protocol
addresses used by the device.

114. As used herein, the terms "records," "information,"
"documents," "programs," "applications," and "materials" include
records, information, documents, programs, applications, and
materials created, modified, or stored in any form, including in
digital form on any digital device and any forensic copies
thereof.

115. As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## SEARCH PROCEDURE FOR DIGITAL DEVICES

116. In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The

36

government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b. The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i. The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the scope of items to be seized. The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of items to be seized.

ii. The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase," "Griffeye," and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c. The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

d. If the search determines that a digital device does not contain any data falling within the scope of items to

37

be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

      e.  If the search determines that a digital device does contain data falling within the scope of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

      f.  If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the scope of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

      g.  The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

      h.  After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

    117. The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel

38

assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

118. The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

**AFFIDAVIT**

I, Martina Doino, being duly sworn, declare and state as follows:

**I.   INTRODUCTION**

1.   I am a Special Agent with the Department of Homeland Security ("DHS").  Immigration and Customs Enforcement ("ICE"), Homeland Security Investigations ("HSI"), and have been so employed since December 2019.

2.   I attended the HSI Criminal Investigator Training Program at the Federal Law Enforcement Training Center("FLETC"), in Glynco, Georgia.  At FLETC, I received training in conducting criminal investigations into customs violations such as general smuggling, narcotics smuggling, interdiction, and distribution of controlled substances.

3.   I am currently assigned to the Los Angeles Border Enforcement Security Taskforce ("LA BEST") in Los Angeles, California, and have been so assigned since August 2021.  LA BEST is a multiagency task force aimed at identifying, targeting, and eliminating vulnerabilities to the security of the United States related to the Los Angeles/Long Beach seaport complex, as well as the surrounding transportation and maritime corridors.  My responsibilities include the investigation of violations of federal criminal laws, including crimes involving money laundering, narcotics trafficking, smuggling, fraud, and immigration violations.

1

4.    Prior to my tenure as a special agent, I was a police officer in Key Biscayne, Florida from February 2015 to May 2019. From July 2018 to May 2019, I was a Task Force Officer ("TFO") on a High Intensity Drug Trafficking Area Task Force, where I participated in investigations into money laundering and drug trafficking crimes in South Florida.  Throughout my law enforcement career, I have participated in numerous criminal investigations involving narcotics importation, exportation or distribution.  Through these investigations, I am familiar with the methods and practices of drug users, drug traffickers, and drug manufacturers.  I have also spoken at length with other HSI SAs and local law enforcement officers regarding methods of drug trafficking and smuggling.

## II.  PURPOSE OF THE AFFIDAVIT

5.    This affidavit is made in support of applications for search warrants for the following:

a.    1365 Darius Ct, City of Industry, California 91745 (the "**SUBJECT PREMISES 1**"), as described more fully in Attachment A-1; and

b.    16815 E Johnson Drive, Hacienda Heights, California 91745 (the "**SUBJECT PREMISES 2**"), as described more fully in Attachment A-2.

c.    The requested search warrants seeks authorization to seize fruits, instrumentalities, and evidence of violations of 18 U.S.C. § 549 (Removing Goods from Customs Custody); 18 U.S.C. § 371 (Conspiracy), 18 U.S.C. § 545 (Smuggling Goods into the United States); and 18 U.S.C. § 542 (Entry of Goods by Means

of False Statements) (collectively, the "SUBJECT OFFENSES"), as described more fully in Attachment B.  Attachments A-1, A-2, and B are incorporated by reference herein.

6.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not purport to set forth all my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## III. Background on Cargo Container Shipments at the Ports of Los Angeles and the Cargo Swapping Smuggling Scheme

7.    United States Customs and Border Protection ("CBP") is responsible for, among other things, the examination of merchandise entering the United States to ensure that it is admissible under and in compliance with United States laws, and the assessment and collection of taxes, fees, and duties on imported merchandise.  In order to properly assess fees, CBP relies on a self-reporting regime in which different custom brokers inform CBP about the contents of the cargo they are trying to import into the United States.

8.    Importers must supply CBP with 10 data elements when bringing goods into the United States which includes: Seller, Buyer, Importer of Record number, Consignee number,

Manufacturer/Supplier, Ship To party, Country of Origin, HTSUS
number, Container stuffing location, and Consolidator/Stuffer
name/address).

9.   CBP has local and national targeting units that
targets shipments that may yield prohibited items.

10.   Once cargo has been selected for CBP examination, CBP
will examine the contents of the cargo for discrepancies such as
verifying whether the manifest is accurate, whether the goods
have consistent country of origin markings, whether there are
contraband or smuggled goods, as well as inspecting for
environmental, and agricultural violations.

11.   Once the shipment has been selected for further
inspection, the container is brought to a Centralized
Examination Site CES (CES) for further inspection.  Containers
are supposed to proceed directly to the CES after being selected
for inspection.

12.   The Port of Long Beach/Los Angeles handles about 40
percent of secondary inspections for the entire country.  Due to
the uniquely high volume at the Port of Long Beach/Los Angeles,
the transportation of the containers selected for further
inspection is not always controlled by CBP.  In fact, the
transportation of some containers selected for inspection is
controlled by the broker who filed the entry/importation
paperwork.  In Los Angeles, custom brokers are allowed to select
their own trucking company to pick up the container and take it
to a CES for further inspection.  This type of drayage, which is
the process by which a container is unloaded, is called broker

4

controlled drayage.  The broker controlled drayage process is unique to the Los Angeles and Long Beach port.  No other domestic ports have this policy in place.

13.  Once cargo containers are ready for transportation at their place of origin, a high security bolt seal is affixed on the doors of the container, by the carrier, to maintain its integrity and to prevent any unauthorized person from gaining access to the cargo.  The purpose of the high security bolt seal is to ensure that the cargo inside the container is not compromised.  Each high security bolt seal has its own unique identification number that is documented on several import documents.  The high security bolt seal number is assigned by the vessel carrier that will transport the sea container to its destination.  Below is a picture of a high security bolt seal.



14.  On February 1, 2023, Customs and Border Protection ("CBP") discovered that cargo was missing from a container that had just arrived from China, and that the missing cargo was replaced, or swapped, with cargo that had clearly already

entered the United States, some of which had already undergone CBP inspection.

15.   This cargo swap was accomplished by using a fraudulent high security bolt seal which cloned the correctly manifested seal and its unique identification number and gave the appearance that the container had not been opened when it fact its contents had been removed and the fraudulent high security bolt seal installed.

16.   Homeland Security Investigations ("HSI") opened an investigation to determine how the cargo swap occurred, what cargo was removed, and who was involved in orchestrating the breaking of the seal and removal of cargo in customs custody.

17.   Since then, CBP has uncovered 102 more incidents of "cargo swapping."   That is incidents, where cargo containers had their high security bolts cut and the cargo inside removed before being inspected by CBP.

18.   HSI investigators have uncovered the cargo swapping scheme is a direct result of persons illegally exploiting vulnerabilities within the customer broker drayage process at the Port of Long Beach, California.

19.   As described above, CBP allows customs brokers to arrange their own transportation between the port terminals and the centralized examination stations (CES) where CBP conducts inspection on imported goods that have been selected for inspection.

20.   HSI has found some brokers, importers, and logistic companies are not following CBP's explicit instructions to deliver containers directly to the CES locations.

21.   The investigation has uncovered that some containers are diverted during the drayage process to prevent customs inspections and bypass custom fees.

22.   Instead of being brought to the CES, HSI found that some containers are brought to an offsite location, the seal is cut, and the cargo is swapped out for recycled used items.  A clone seal matching the numbers of the original seal is then placed on the container.  The container is ultimately delivered to be inspected by CBP.

23.   HSI has concluded the smuggling scheme undermines the Government's ability to inspect goods coming into the United States, prevent prohibited items from entering the United States, and impose appropriate custom duty fees.

24.   Although the exact number of swapped cargo incidents are currently unknown, a conservative estimate of losses would be around $50,000 dollars per diverted container in lost custom fees and fines.  Based on the over 100 documented incidents, HSI believes that the scheme has resulted in at least approximately $5,000,000 in lost revenue to the United States.

25.   In March 2024, federal agents were able to determine the cloned seals were being imported via the international mail from China by targets of the investigation.  Agents began an investigation that included intercepting the air parcels, documenting the seal numbers, and placing CBP holds that would

trigger controlled drayage on the impacted shipping containers. This operation led to the identification of more than 40 air parcels containing approximately 88 cloned seals and 79 associated sea containers.

26.   To date HSI has seized more than $50,000,000 worth of prohibited items that would have been diverted and entered the United States without inspection.  The numbers continue to grow every day has more inspections are completed and items are discovered.

## IV.   SUMMARY OF PROBABLE CAUSE

27.  On March 9, 2024, CBP officers intercepted a FedEx package at the international mail facility in Memphis, Tennessee.  This package contained one yellow CMA CGM lock set numbered R5741956 labeled "lockset."  The CMA CGM lock was determined to be a duplicate seal for container number TCNU6659916 (the "9916 Container"), which had already been assigned the same lock set number and was slated to arrive at the Port of Long Beach, on March 19, 2024.

28.  The FedEx package with the fraudulent seal arrived in the United States from China, addressed to an individual named "Liam" at **SUBJECT PREMISES 1** located in the City of Industry, California.  The phone number listed on the shipping label was 626-643-4499.

29.  On March 21, 2024, federal agents conducted an inspection of the 9916 Container and found it contained various

8

items that were not manifested correctly including counterfeit BIC lighters, prohibited food items, and electronic bongs.

30.   On March 17, 2024, CBP officers intercepted two DHL packages at the international mail facility in Los Angeles, California.  The DHL packages arrived in the United States from China, addressed to a "SONIC" at **SUBJECT PREMISES 2** located in the City of Industry, California.

31.   These package contained two identical high security bolt COSCO[1] seals lock sets numbered SYA0247776 and SYA2110804 labeled "lock steel."  The COSCO locks were determined to be duplicate seals for container number GCXU5487131 (the "7131 Container") and container number CSNU8204660 (the "4660 Container"), which had already been assigned the same lock set numbers and were slated to arrive at the Port of Long Beach, on March 4, 2024.

32.   On May 6, 2024, federal agents conducted an inspection of the 4660 Container and found it contained prohibited Hydrofluorocarbons "HFCs".  The items were not manifested.

33.   Since the February 1, 2023, incident until May 17, 2024, CBP has uncovered 102 more incidents of "cargo swapping". HSI investigators have associated approximately 2 of these incidents to Weijun Zheng aka "Sonic", a Chinese citizen born on June 5, 1957. ZHENG owns and operates multiple logistic businesses at **SUBJECT PREMISES 2.**

---

[1] I know that COSCO is a vessel carrier and they maintain a type of high security bolt lock on the cargo containers on their vessels.

34.   Based on this investigation, federal agents began targeting international mail parcels destined for **SUBJECT PREMISES 1 and 2**.  From March through May 2024, Law enforcement was able to identify and inspect six additional packages destined for **SUBJECT PREMISES 1 and 2**.  The inspections led to the discovery of approximately eleven cloned seals.  The cloned seals correlated to nine shipping containers destined for the Port of Long Beach.

### V.   STATEMENT OF PROBABLE CAUSE

35.   Based on my review of law enforcement reports and court records, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

### A.   CBP Finds a Cloned Seal for Destined for SUBJECT PREMISES 1

36.   On or about March 8, 2024, Task Force Officer Han Yit and I contacted CBP officers at the Memphis, Tennessee International Mail hub regarding a package that had arrived at the facility from China.

37.   I learned from CBP officers that law enforcement at the Memphis facility conducted a border search of the FedEx package after it arrived from China.[2]  They opened it and found

---

[2] I understand that CBP officers examined the package under their authority to conduct border searches and secondary examinations of international mail and shipments arriving from foreign countries pursuant to Title 19, Code of Federal Regulations, Section 162.6.

a yellow CMA CGM lock set with number R5741956, which they determined to be a duplicate seal for the 9916 Container.

38.  CBP Officer Travis Corey determined that the listed shipper of the package was Yiwu Moheng Electronic Commerce Co, 1 St floor building Unit 1 Building 12, Yiwu, China.

39.  The listed recipient of the package was an individual named Liam at **SUBJECT PREMISES 1**.  The phone number listed on the label was 626-643-4499.

40.  CBP Officers repackaged the package and released it to be delivered into United States.  The package was then delivered to **SUBJECT PREMISES 1** on or around March 11, 2024.

41.  On March 19, 2024, the 9916 Container arrived at the Port of Long Beach, aboard the vessel CMA CGM Swordfish from China.  The 9916 Container was manifested as containing "Stainless Steel Cups".

42.  The bill of lading shows the shipper as Kingsun Shipping Co., LTD, at room 2505 Lushan Building, Louho District, Shenzhen, China.  The consignee was listed as Kings International Group Inc. doing business as KIG Solutions, at 440 East Huntington Drive, 3rd Floor, Arcadia, California, 91006.

43.  On March 21, 2024, federal agents inspected the 9916 Container, based upon the previous interception of the FedEx package, and determined that the real CMA CGM seal number was a positive match to the fraudulent seal number observed inside the FedEx package.

44.  Inside the 9916 Container, federal agents discovered a variety of counterfeit products and prohibited food items.

11

Based on my knowledge of custom laws and regulations, I know that these items would not have been permitted entry into the United States if inspected.

45.  Based upon my knowledge of the investigation, I believe that the recipient of the cloned seal intended to divert the 9916 Container and replace its contents before CBP could inspect it.

**B.   HSI Finds Multiple Cloned Seals Destined for SUBJECT PREMISES 2**

46.  On or about April 16, 2024, Task Force Officer Han Yit and I contacted CBP officers at the Los Angeles, California International Mail hub regarding two packages that were slated to arrive at the facility from Hong Kong the following day on April 17, 2024.

47.  On April 20, 2024, I conducted a border search of the two packages.  After opening both packages, I found two sets of COSCO lock sets with numbers SYA0247776 and SYA2110804 labeled "lock steel" which I determined to be a duplicate seal for the 4660 Container.

48.  I examined the package under my authority to conduct border searches and secondary examinations of international mail and shipments arriving from foreign countries pursuant to Title 19, Code of Federal Regulations, Section 162.6.

49.  I found that the listed shipper of both packages was SZ Convenient Supply Chain CO LTD, 3F Building 6 Jinxiang, Hong Kong, Hong Kong.

50.   The listed recipient for both packages was "Sonic" at **SUBJECT PREMISES 2.**

51.   I repackaged the packages and released them to be delivered into United States.  The packages were then delivered to **SUBJECT PREMISES 2** on or around the following week.

52.   On April 4, 2024, the 4660 Container arrived at the Port of Long Beach, aboard the vessel Cosco Netherlands from China. The 4660 container was manifested as containing "Air Conditioning Fan."

53.   The bill of lading shows the shipper as Guangdong Manbin Logistics Supply Co.  The consignee was listed as Best Line Supply Chain USA UBC, with an address of 8055 East Tufts Avenue, Denver, Colorado 80237.

54.   On May 6, 2024, CBP officers inspected the 4660 Container and found it contained Hydrofluorocarbons "HFCs"[3] which I understand to be prohibited within the United States. No air conditioning fans were encountered.  The items inside the container were not properly manifested.

55.   Based on my knowledge of this investigation, I know HFCs are a commonly smuggled product due to their resale value.

---

[3] Hydrofluorocarbons (HFCs) are a group of synthetic gases primarily used for cooling and refrigeration.  Many HFCs are very powerful, short-lived climate pollutants with an average atmospheric lifetime of 15 years.

**C.     Investigation of Jenny CHEN and Sonic ZHENG Reveal Connections to SUBJECT PREMISES 1 and 2**

56.   Based on previously identified cargo swapping events, interviews, and evidence recovered from seized devices of Targets of this investigation I know the following:

57.   On January 3, 2024, federal agents, including myself, interviewed a transportation logistics coordinator named Jesse ROSALES, regarding his involvement in several cargo swapping events.  Law enforcement had previously identified ROSALES as a co-conspirator in the smuggling cargo swapping scheme described above.

58.   During the interview, ROSALES told me that he worked for a Chinese couple named "Jenny and Sonic" who operated a business at **SUBJECT PREMISES 1**.  ROSALES stated he was given instructions by "Jenny and Sonic" to arrange transportation of containers from the Port of Long Beach, California.

59.   On January 22, 2024, I obtained a search warrant from the Honorable United States Magistrate Judge Alka Sagar, in case number 2:24-MJ-00308, to search ROSALES' mobile device.

60.   During my review of that device, I saw pictures of cloned seal number OOLHYX7844 time stamped September 15, 2023, at 2:48 p.m.  Based on a review of law enforcement databases, I know this seal number belonged to container number GCXU5622150 (the "2150 Container"), which had arrived at the Port of Long Beach on August 30, 2023, and was out gated[4] on September 15,

_____

[4] When a container is "out gated" a terminal out gate ticket is provided to truck drivers when exiting a terminal that

2023, at approximately 3:51 p.m.  The time stamps on the pictures indicated that they were taken prior to the departure of the container from the terminal.

61.  The fact that the picture was taken before the truck carrying the 2150 Container left the terminal suggests to me that the cloned seals were prepared in anticipation of the container's arrival in the United States.

62.  I also saw pictures of the 2150 Container being offloaded at **SUBJECT PREMISES 1** dated September 15, 2023, at 6:00 p.m.  From conversations with other law enforcements officers, I understand that agents recognized the loading docks of **SUBJECT PREMISES 1** in the picture based on previous surveillance of the location.

63.  Based on my review of the photographs, the time stamps indicate that pictures were taken while the container was supposed to be in drayage to the CES location.

64.  Based on documents voluntarily provided by the Price CES I know that the 2150 Container was delivered at approximately 8:33 p.m. on September 15, 2023, to the Price CES, in Carson, California, which was approximately four hours and forty-two minutes after the container was picked up from the port.  The total distance between the terminal and CES is approximately seven miles.  The fact that it took the 2150 Container over four hours to reach the Price CES suggests to me

---

includes the container number in their possession and time stamps of their departure.

that it was illegally diverted to a third location prior to it being delivered to the Price CES.

65.  Based on my investigative findings I know that CBP later determined that the 2150 Container had a fraudulent cloned seal and tampered contents.

66.  During my review of ROSALES' phone, I also observed a text message conversation between ROSALES and a contact labeled "Sonic" with phone number 626-606-6112 discussing the movement of cargo containers.  One particular message dated August 15, 2023, at 10:32 p.m. contained a screen shot from Sonic to ROSALES of an appointment window[5] for container number OOLU6779024 (the "9024 Container").

67.  Based on my investigative findings I know the 9024 Container was picked up from the port on August 16, 2023, the day after that text message was sent which means that Sonic and ROSALES were discussing the container before it arrived in the United States.  CBP determined that the 9024 Container also had a cloned seal and tampered contents.

68.  This text message exchange leads me to believe Sonic and ROSALES organized the drayage and diversion of the 9024 Container in order to evade CBP inspection of the goods.

69.  I determined that the phone number 626-606-6112, discussed above, is registered to Jenny CHEN, ZHENG's Wife and

---

[5] An appointment window is a time frame provided by the terminal to truck drivers when they can come retrieve the sea containers for inspection.  Depending on the terminal operations, some appointment windows are for one hour while others can vary two to four hours or more.

ROSALES' alleged employer, based on the subscriber records described below.

70.   I subpoenaed AT&T mobile for subscriber data for the phone number 626-606-6112.  Based on the information provided by AT&T, the phone number was registered to Jenny CHEN with a billing address of 462 Borrego CT, San Dimas, California, 91773. The account was closed on November 1, 2023.

71.   I determined that the phone number listed on the FedEx package destined for **SUBJECT PREMISES 1** described above in paragraph 29, containing one cloned seal, was 626-643-4499, and that this phone number is registered to Jenny Chen, Zheng's Wife and Rosales' alleged employer, based on the subscriber records described below.

72.   I obtained records containing subscriber data and phone tolls from AT&T mobile for the phone number listed for the package containing the cloned seal, 626-643-4499.  Based on the information provided by AT&T, the phone number listed for the package was registered to Jenny Chen, with a billing address of 475 Carpio Drive, Diamond Bar, California, 91765.

73.   I reviewed phone tolls for 626-643-4499 which revealed calls to Rosales during the time of the previously identified cargo swapping events on or around July 2023.

74.   I reviewed law enforcement records for Jenny Chen that showed that 475 Carpio Drive, Diamond Bar, California is her current address.  Also, according to law enforcement records, I know that Jenny Chen and Weijun Zheng are married. Chen is a

naturalized United States Citizen, and Zheng has a lawful permanent resident card.

75.   Based on official travel documents, I know Sonic ZHENG's legal name is Weijun Zheng, date of birth June 5, 1957.

76.   Zheng has several registered businesses at **SUBJECT PREMISES 2**, which I know based on surveillance and GPS data is a few blocks away from **SUBJECT PREMISES 1**.

77.   Law enforcement database checks of the phone number 626-643-4499 show that this phone number is associated with other import shipments for the following companies: Gold Will, ECON Logistics, and Winglong trade Co LTD which are all businesses registered to Zheng at **SUBJECT PREMISES 2.**

78.   Based on an open database search, Zheng is the Chief Executive Officer of Gold Will, Winglong Trade and Econ Logistics, which are located at **SUBJECT PREMISES 2.**

79.   On March 30, 2024, Zheng arrived at the Los Angeles International Airport on China Southwestern Flight CZ327.  Zheng told CBP officers phone number 626-643-4499 was his number.  I know based on a review of my investigative findings that this phone number was on the FedEx shipping label previously intercepted that contained the cloned seal for the 9916 Container described above in paragraph 29 that was destined for **SUBJECT PREMISES 1.**

**D.  Law Enforcement Intercept 11 Cloned Seals Destined for SUBJECT PREMISES 1**

80.  I know based on air shipment history that there was a prior FedEx package also described as "lockset" coming from China that was delivered to **Subject Premises 1** on March 11, 2024.  This package was not inspected.

81.  Based on the prior history and the discovery of the first FedEx air shipment, federal agents began targeting international mail parcels destined for **SUBJECT PREMISES 1 and 2.**

82.  Between March through May 2024, law enforcement was able to identify and inspect six additional packages destined for **SUBJECT PREMISES 1**.  The inspections led to the discovery of approximately eleven fraudulent cloned seals.  The cloned seals correlated to nine shipping containers destined for the Port of Long Beach.

83.  As a result of these seizures, CBP placed custom holds on all nine associated shipping containers and controlled the drayage from the Port to the CES facilities.

84.  During the inspections of some of these containers, federal agents discovered a variety of counterfeit products including prohibited food items, drug paraphernalia, and other unmanifested items.

85.  Based on the existence of the cloned seals, in conjunction with the results of the custom inspections, I believe the containers were likely going to be diverted to **SUBJECT PREMISES 1** where the cargo would have been swapped out.

**E.   Cargo Swapping Event On August 7, 2023, Linked To
SUBJECT PREMISES 2**

86.   I know from reviewing law enforcement records, that on
July 24, 2023, container number MATU2312322 (the "2322
Container") arrived at the Port of Long Beach, California aboard
MATSON Hawaii from Shanghai, China.  Previously, on July 20,
2024, CBP placed an examination hold to inspect the contents of
the 2322 Container.

87.   On August 7, 2023, the 2322 Container arrived at the
Price CES located in Carson, California at approximately 2:00
a.m.

88.   According to the terminal out gate ticket, I know that
the 2322 Container was picked up at the Pier A Terminal inside
the Port of Long Beach on August 7, 2024, at approximately 11:39
a.m.

89.   Based on my review of the terminal in gate ticket[6]
from the Price CES, I know that the container took almost five
hours and forty minutes to reach the Price CES.  The total
distance between the Price Centralized examination station and
the Fenix Marine Terminal is approximately 11 miles, with an
estimated 25-minute drive time at peak traffic.  The fact that
it took the 2322 Container over five hours to reach the Price

---

[6] Similar to an out-gate ticket, a terminal ingate ticket
is a document provided to truck drivers when entering a terminal
that includes the container number in their possession and time
stamps of their arrival.

CES suggests to me that it was illegally diverted to a third location prior to it being delivered to the Price CES.

90.   I know from reviewing law enforcement reports that on August 9, 2023, CBP inspected the contents of the 2322 Container and found masks and hoola hoops.  Additionally, CBP officers discovered an old door flag from another CES called Cal Caltrage.  A door flag is a document utilized by the CES employees to organize the contents of a shipment for inspection. Door flags are placed on items within a cargo container.  The presence of the door flag indicates that the cargo had already been inspected by CBP.

91.   Based on the original import documents provided by CBP, I know the 2322 Container was manifested as containing laptop stands and freight of different kinds.  When CBP officers concluded the 2322 Container was a swapped cargo incident, they requested the importer of record to update the manifest to reflect the goods found by CBP.

92.   CBP requires shipments with a value greater than $2500 file a formal entry.  The broker/importer has 15 days after the vessel arrives to file a formal entry.  There are times when CBP requires the broker/importer to update the entry because CBP found items that were manifested in the original entry or the entry might of changed due to a seizure within the shipment.  In this case, CBP officers found masks and Hoola hoops.

93.   CBP received an updated 3461 Entry form from the broker, which I have reviewed, which showed Winglong Trade CO

LTD at **SUBJECT PREMISES 2** as the ultimate consignee of the 2322 container.

### H. Additional Businesses at SUBJECT PREMISES 1 and 2

94.    During the course of my investigation, I have determined that there may be businesses unrelated to the cargo swapping scheme operating out of **SUBJECT PREMISES 1** and **2**. Specifically, at **SUBJECT PREMISES 1**, I have reviewed a website listing that seem to indicate that Anjian Global may be operating from **SUBJECT PREMISES 1**.  I have found an active California state registration for Anjian Global.  Based on my knowledge of the investigation and review of mail scheduled to be delivered to **SUBJECT PREMISES 1**, I believe that the majority of the entities operating from **SUBJECT PREMISES 1** are associated with the cargo smuggling scheme.

95.    Similarly, at **SUBJECT PREMISES 2**, I determined that a company, Winstar Textile Inc., which has an active listing with the California Secretary of State, appears to operate from **SUBJECT PREMISES 2**.  Based on my knowledge of the investigation and review of mail scheduled to be delivered to **SUBJECT PREMISES 2**, I believe that the majority of the entities operating from **SUBJECT PREMISES 2** are associated with the cargo smuggling scheme.

### VI.   TRAINING AND EXPERIENCE REGARDING SMUGGLING

96.    Based on my training and experience, I am familiar with the methods employed in smuggling operations and the patterns employed by smuggling organizations.  I have also spoken with other experienced agents and other law enforcement

22

officers about their experiences and the results of their
investigations and interviews.  I am knowledgeable in the
methods and modes of smuggling operations and the language
patterns of these groups.  I have become familiar with the
methods of operation typically used by smugglers.  Based on my
training, experience, my conversations with other law
enforcement officers, and my knowledge of this investigation and
others, I am aware of the following:

97.  Smugglers frequently conduct their illegal activities
inside of secure locations, which are private, but to which they
have ready access; therefore, the location where a cargo
container is opened is likely to be an area where persons who
are engaged in smuggling are located and conduct their
operations.

98.  Smugglers will frequently keep the smuggled goods
supplier and customer records, and other items relating to their
smuggling activities at their residences (including garages and
outbuildings on their properties), businesses, and other secure
areas, such as storage lockers.

99.  Smugglers also conceal items related to their crimes
in vehicles, including vehicles outside of their residences, or
Businesses so that they have ready access to them and so that
they can hide them from law enforcement, including law
enforcement officers executing search warrants at their
residences or businesses.

100.  Smugglers will often have secret show rooms inside a
business or residence to showcase the smuggled goods available.

Including in locked safes, drawers, and filing cabinets.

101.  Smugglers will often receive goods on a regular basis. Such smugglers will thus have an "inventory" which will fluctuate in size depending on the demand for the product.

102.  Smugglers often use one or more telephones, pagers, or other digital devices to negotiate times, places, schemes, and manners for importing, possessing, concealing, manufacturing, and distributing smuggled goods, and for arranging the proceeds from the sale of the smuggled goods.  Additionally, I know that professional smugglers depend upon maintaining both long-distance and local contacts with both suppliers and those down the organizational chain, to the local distributors.

103.  Data contained on digital devices used by smugglers often include, among other things, records of telephone calls, text messages, and e-mail and social media communications between the Smugglers and the co-conspirators; Global Positioning System ("GPS") information and other location information that can help identify stash locations, meeting places, and smuggling routes; and identifying information about the smugglers and co-conspirators, such as contact lists, calendar appointments, and photographs or videos.

104.  Individuals involved in smuggling often have in their possession – that is, on their persons, at their residence, and/or at their stash houses – firearms, including handguns, pistols, revolvers, rifles, shotguns, machine guns and/or other weapons, as well as ammunition and ammunition components, that are used to protect and secure the smuggling property.

24

105.  Individuals involved in smuggling typically pay or receive large sums of money for goods.  Therefore, smugglers typically have significant amounts of cash on hand, as proceeds of sales, to purchase their own supplies, or as profits from their smuggling activities (such as profits from sales or profits from the transportation of smuggled goods).

106.  Smugglers also often maintain in their residences, businesses or vehicles documents relating to their communication devices, in the form of receipts, bills, telephone and address books, and other books and papers which reflect, among other things, the names, addresses, and/or telephone numbers of their customers, co-conspirators, and associates in the smuggling organization.

107.  Individuals involved in smuggling goods can provide goods on credit to trusted distributors in their organization and can obtain smuggled goods from their suppliers on credit. Therefore, I am aware that individuals involved in smuggling goods maintain books, records, customer lists, receipts, notes, ledgers, and other papers relating to the transportation, receipt, ordering, sales, and distribution of goods, proceeds, and equipment, and that such documents may be in code to attempt to thwart law enforcement.

## VII. TRAINING AND EXPERIENCE ON DIGITAL DEVICES[7]

108. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I

---

[7] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing

know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable

_____

data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

109. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which

may take substantial time, particularly as to the categories of electronic evidence referenced above. Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.   Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

110. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VIII.   <u>CONCLUSION</u>

111. For all the reasons described above there is probable cause to believe that evidence of violations of the SUBJECT OFFENSES, as described above and in Attachment B, will be found in a search of the SUBJECT PREMISES, as further described in Attachments A-1 and A-2.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 21 day of June,
2024.


_____
HONORABLE ALKA SAGAR
UNITED STATES MAGISTRATE JUDGE